UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WSP USA INC.,

          Plaintiff,

      v.

NAUTILUS INSURANCE COMPANY,

          Defendant.

No. 19 CV 6731

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff WSP USA, Inc. was a contractor on a construction project for the CTA. WSP subcontracted some work, including the role of safety manager, to GSG Consultants. A worker on the project fell and sustained serious injuries. WSP seeks coverage from GSG's insurer, defendant Nautilus Insurance Company, as an additional insured on the policy. Both sides brought motions for summary judgment. Nautilus's motion is denied; WSP's motion is granted as to liability but denied as to damages.

## I.     Legal Standards

Summary judgment is warranted when the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views "the facts and draws reasonable inference in the light most favorable to the non-moving party."

*Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023). On cross-motions for summary judgment, a court must draw inferences "in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020) (citation omitted). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012). "The interpretation of an insurance contract is a legal issue that may be decided on a motion for summary judgment." *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021).

## II.    Facts

### A.    Parties and Contracts

The Chicago Transit Authority operates the Loop Elevated rail lines in downtown Chicago. [119] ¶ 1.[1] As part of the CTA's capital improvement program, from 2011 to 2014, those rail lines were renewed and revitalized through a project called the "Loop Track Renewal Project." [119] ¶ 2.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from the parties' responses to Local Rule 56.1 statements of facts and additional facts where both the asserted fact and response are set forth in one document. [119], [121], [124], [126]. I disregard legal conclusions and facts that are irrelevant. *See* [124] ¶¶ 8, 10–12; [121] ¶¶ 14, 55; [119] ¶¶ 3, 14–15, 21, 33, 62, 66. Citations to redundant facts have been omitted. *See* [126] ¶¶ 1, 6–7; [124] ¶ 3. Local Rule 56.1 (e)(2) prohibits the assertion of a new fact in a response, so additional facts in a response are not properly before the court. S*ee* [119] ¶¶ 32, 47, 49–57.

The CTA contracted with several parties to do the work on the Loop Track Renewal Project—general contractor, Ragnar Benson Construction LLC, and the plaintiff in this action, WSP USA, Inc. [119] ¶ 4.[2] In July 2011, the CTA hired WSP for construction management services in connection with the CTA's five-year Capital Improvement Program; the July 2011 contract is referred to the "Prime Agreement" or "Prime Contract." [121] ¶ 9; [99]; [109-5]. WSP is an engineering consulting firm; one of the services they provide is construction management. [119] ¶ 9; [121] ¶ 1.[3] Construction management services do not build a structure, instead WSP was hired "to make sure that the contractor is building their work correctly." [119] ¶¶ 10, 6.

The CTA assigned work on specific projects to WSP through Task Orders; it assigned WSP to work on the Loop Track Renewal Project through Task Order No. 1. [119] ¶ 5; [101]. The Task Order provided that WSP, as Construction Management Consultant, "shall provide construction management, quality assurance, safety oversight and field engineering support to CTA Engineering and Capital Construction […]." [101] at 4. WSP's project manager on the Loop Track Renewal Project was responsible for ensuring the project had the right staff from WSP and

---

[2] At the time of the work, WSP USA, Inc. was known as "PB Americas, Inc" and it had previously been known as "Parsons Brinckerhoff, Inc." [121] ¶¶ 9, 11; [119] ¶ 7. No party is challenging that it is the same entity and to decrease confusion, I refer to the entity as "WSP" throughout the opinion.

[3] WSP objects to Nautilus's characterization of it as an "engineering firm." [119] ¶¶ 4, 9. The record citation supports the description of WSP as an "engineering consulting firm." [109-1] at 21:7–11 ("WSP is a[n] engineering consulting firm. We do design. We design transportation projects. We design building construction projects. We have environmental resources. We're a consulting firm.). The record citation also reflects that one of WSP's services is construction management—"What type of work did the construction services group do in 2013? We were construction managers. Construction management for different clients across essentially north—northern Illinois." [109-1] at 31:1–5; [121] ¶ 1.

"that [WSP] had our subconsultants in place and their – manage their agreements."
[109-1] at 114:2–19; [119] ¶ 40.

### 1.   WSP Subcontracts

WSP in turn contracted with several other companies, including GSG
Consultants, to fulfill its requirements to the CTA under the Prime Contract and
Task Order No. 1.

WSP and GSG Consultants agreed that GSG would provide project
construction management services on a task order basis for the CTA's five-year
Capital Improvement Program. [121] ¶ 11; [119] ¶ 34; [109-6]; [106]. The subcontract
provided that "duties will differ from project to project, but will generally include
construction management, quality assurance and field engineering responsibilities"
and further provided that the specific services to be performed would be defined in
each task order. [106] at 3; [121] ¶ 13.

WSP assigned GSG to work on the Loop Track Renewal Project through Task
Order No. 1. [121] ¶¶ 15–16; [109-8]. The WSP–GSG Task Order No. 1 states that
GSG will provide a "Safety Manager, Lead Field Engineer and Person-in-Charge
support. The Safety Manager will monitor both Construction Management and
contractor construction operations to assure work is performed in compliance with
approved safety plans." [109-8] at 4; [119] ¶ 35; [121] ¶ 17, 19.[4] A safety manager
"review[s] the contractor's safety program, safety plan submitted for a project,

---

[4] The parties dispute whether WSP subcontracted safety oversight in its entirety, 24/7, to
GSG. [121] ¶ 18; [119] ¶ 37. That dispute is immaterial.

provide[s] recommendations to the CTA for acceptance or corrections that need to be made" and then "make[s] sure that the contractor is following their safety plan during the construction of the project." [109-1] at 107:17–108:1; [121] ¶ 20.[5]

GSG hired Joy Banks to be the safety manager for the Loop Track Renewal Project. [121] ¶ 21; [119] ¶ 36.[6] Banks testified that during the Loop Track Renewal Project she was responsible for providing "oversight to the contractor as they perform their work, review their process plans, discuss upcoming safety plans, [make] safety observations, [and] manage unusual occurrence reports." [121] ¶ 22. In her deposition for the Lopez case, Banks stated that her job was to observe the contractors performing their work and if anything required immediate corrective action, she would speak with the general contractor or correct the issue herself. [121] ¶ 32.

---

[5] Nautilus objects to ¶ 20 of WSP's Local Rule 56.1 statement of fact because the record citation is to WSP's corporate representatives describing a safety manager's role generally, not *the* GSG's safety manager's responsibilities in the Loop Track Renewal Project. [121] ¶ 120. WSP's corporate representative's testimony about what safety managers do generally is still relevant to the question of what work WSP contracted to do for CTA and what it contracted out to GSG. Furthermore, in the cited testimony, WSP's corporate representative is referring to the "Construction Management Services for Loop Track Renewal Proposed Task Order #1—PB Scope of Work." *See* [109-1] at 90:3–4; 108:9–10 (referring to WSP 657). The WSP–GSG Task Order No. 1, [109-8], incorporates this document into its own terms as Exhibit B. *See* [109-8] at 4 ("The detailed Construction Management Services for Loop Track Renewal, Proposed Task Order #1—PB Scope of Work is made part of Exhibit B."); *compare* [101] at 4–10 (Bates-stamped as WSP 657–63) *with* [109-8] at 7–13. WSP's corporate representative was reviewing a document that was incorporated into the WSP–GSG Task Order No. 1, and therefore his testimony about the roles described in the document is directly relevant to what work GSG was doing for WSP on the Loop Track Renewal Project, and is not parol evidence.

[6] WSP objects to the portion of ¶ 36 of Nautilus's Local Rule 56.1 statement of fact that asserts Banks "worked under the direction of WSP" as unsupported by the record citation. [119] ¶ 36. That objection is sustained. The cited portion of the record merely establishes that Banks worked on the project, not that she worked under WSP direction.

Banks's work included safety oversight as it relates to fall protection. [121] ¶ 23. One of the ways that Banks communicated with the contractor was to write safety observations reports that noted when she observed safety violations and what corrective actions she took; those reports included violations of fall protection requirements. [121] ¶ 24. Banks was on site during weekend work; she discussed her schedule directly with the "people on the project," not with GSG. [124] ¶ 6; [119] ¶ 41.[7] She worked on a shift basis and was not expected to observe and report on safety violations when she was not on shift. [124] ¶ 4.[8] When Banks was not working, there was no expectation that she or anyone else from GSG would be responsible for reporting safety issues. [124] ¶ 5.[9]

WSP also subcontracted with Program Management Control Services for track construction and track specialist support. [119] ¶ 12. As a track specialist, PMCS performed "field engineering or inspector responsibilities related to the track construction" and provided "inspection and project control services." [119] ¶ 13. A track specialist/field engineer's job duties were defined in the Task Order between the CTA and WSP as "monitoring the construction contract work on a daily basis to

---

[7] WSP objects to ¶ 41 of Nautilus's Local Rule 56.1 statement of fact because the assertion that Banks "reported to WSP" and "performed work … as assigned by WSP" is not supported by the record citation. [119] ¶ 41. The record citation supports the assertion that Banks communicated with WSP about scheduling, but does not support the assertion that WSP assigned her work.

[8] The cited portion of Banks's deposition supports the assertion that she worked on a shift basis and was not observing or reporting on the site when she was not at work. WSP's objection is overruled.

[9] The cited portion of Banks's deposition supports the assertion and WSP's objection is overruled.

ensure the project is completed in accordance [with] CTA's safety, quality, cost and schedule objectives." [124] ¶ 1; [109-8] at 12.

### 2.    Contractual Insurance Requirements

The Prime Contract required WSP to obtain commercial general liability insurance, with limits of $2 million per occurrence, and add the CTA as an additional insured on the policy. [121] ¶ 10. WSP had a commercial insurance policy with Liberty Insurance Corporation, policy number TB7-621-094060-022, with a policy period from October 1, 2012 to October 1, 2013. [119] ¶ 29.[10]

The WSP–GSG contract incorporated all the terms and conditions of the Prime Agreement (between WSP and CTA) and stated, "Subcontractor [GSG] assumes toward [WSP] all the obligations and responsibilities which [WSP], by the Prime Agreement, assumes towards the Client, and Subcontractor [GSG] shall be bound to observe all such terms and conditions to the same extent as [WSP] is bound to the Client." [109-6] at 3 (N000345); [119] ¶ 35. Those obligations and responsibilities included obtaining commercial general liability insurance and adding WSP as an additional insured. [121] ¶ 12; *see WSP USA Inc. v. Nautilus Ins. Co.*, No. 19 CV 6731, 2021 WL 4804082, at *5 (N.D. Ill. Oct. 14, 2021).[11] GSG had an Environmental

---

[10] WSP denies ¶ 29 because the named insured on the policy, [114-1], is Parsons Brinckerhoff Group, Inc, not WSP. [119] ¶ 29. But WSP asserted that it was formerly known as "PB Americas, Inc." and "Parsons Brinckerhoff, Inc." [121] ¶¶ 9, 11. WSP does not cite any evidence that "Parsons Brinckerhoff Group, Inc." is a materially distinct entity from WSP, which is apparently a successor entity to Parsons Brinckerhoff and PB Americas.

[11] Nautilus objects to this statement on the basis that it is inconsistent with the legal analysis in the Memorandum Opinion on the Motion to Dismiss. [121] ¶ 12. I disagree. I held that GSG assumed the obligations and responsibilities to WSP that WSP had to CTA, including the obligation to obtain commercial general liability insurance and to add WSP as an additional insured. [76] at 12. That is in accord with WSP's assertion that, "The GSG

Combined Policy from Nautilus Insurance Company, Policy Number ECPO1519891-12, with a policy period of August 13, 2012 to August 13, 2013. [121] ¶ 2; [119] ¶ 43. The policy was issued by Nautilus and serviced by Berkley Specialty Underwriter Managers and its successors. [119] ¶ 44. The policy includes commercial general liability coverage. [121] ¶ 5. The policy identifies GSG as located in Chicago, Illinois. [121] ¶ 3.

### B. Fall and Lawsuit

On March 10, 2013, Carlitos Lopez, a laborer working on the Loop Track Renewal Project, fell from the "L" track and suffered injuries. [119] ¶ 22; [121] ¶¶ 25–26.[12] The parties submit evidence about the fall from three reports—one written by Loren Whitney, the Ragnar Benson corporate safety director, on March 11, 2013, a second written by Eric Goetschel, the area manager, on March 11, 2013, and a third written by Nick Vargas and Charles Begin on March 12, 2013. *See* [109-14] at 1, [104-3], [104-1].[13] According to the Vargas–Begin report, Lopez was "installing a tie on the Brown and Purple Line BN track from the outer loop" when he fell from the track to the ground. [119] ¶ 23. Lopez had been issued "personal fall protection equipment, including a full body harness, retractable lifeline, and a rail slider to facilitate tie off." [104-3] at 2; [119] ¶ 24.

---

Subcontract specifically required, by incorporation, that GSG comply with the terms and conditions of the Prime Contract, including the requirement that GSG assume towards WSP all insurance requirements WSP had in turn assumed towards the CTA." [121] ¶ 12. The objection is overruled.

[12] Mr. Lopez was employed by Railworks Track Services, Inc., a company hired by the general contractor to provide track construction services. [119] ¶ 11.

[13] The reports do not make a determination about the cause of Lopez's fall.

Whitney's report states that Lopez was wearing his issued fall protection equipment, including a full body harness and retractable lifeline and that "a rail slider was attached to the rail in the area of the fall." [109-14] at 1. Whitney reported that he "looked at Lopez's retractable and the carabineer that is attached to the rail skate was intact and operation, but the retraction cable and the double locking hook that attached to the harness D ring was missing and the cable had pulled back into the retractable housing." *Id*. The Goetschel report stated that Lopez was "wearing all issued personal fall protection equipment and a rail slider was attached to the rail in the area of the fall." [104-3] at 2. The Vargas–Begin report states that at the time of the fall, Lopez had on a safety harness and lanyard, but the lanyard was not connected to either a static line or rail skate. [119] ¶ 23.[14]

Plaintiff submitted an affidavit from Lopez regarding the accident. [118-1]. According to Lopez, he had been wearing a safety harness tied to a rail skate immediately prior to the fall. [126] ¶ 2. The fall happened when Lopez "was in the process of detaching and reattaching the rail skate from the rail in order to move the rail skate around a joint in the "L" track" and his rail skate was detached from the rail. [118-1] ¶¶ 4–5; [126] ¶¶ 3–4. Lopez's safety harness did not break free. [126] ¶ 5. Nautilus disputes Lopez's account and the cause of his fall.

---

[14] Rail skates are two pieces of metal joined together that slide along the rail and to which the worker can connect a rope (the "retractable") from their harness in order to prevent them from falling to the ground if they lose their balance. [109-13] at 37–52; *see also* [109-13] at 30:1–22; 34:7–35:23 (Banks's testimony).

Banks, the GSG safety manager, was not on site when Lopez fell because her shift had not yet started. [119] ¶ 38–39. The field engineer on site that day was an employee of PMCS, the subconsultant hired by WSP. [124] ¶ 2.[15]

Lopez and his wife sued the CTA, WSP, and Ragnar Benson for damages based on the fall in the Circuit Court of Cook County. [119] ¶ 26; [121] ¶ 27.[16] The first complaint named only the CTA, but an amended complaint in early 2015 added WSP and Ragnar Benson. [119] ¶ 27; [109-11] (2015 Amended Complaint).

In the 2015 Amended Complaint Lopez alleged that Ragnar, the general contractor, and WSP "jointly and/or individually, and/or by its agents, servants or representatives, pursuant to contract, and/or otherwise voluntarily did undertake the protection of personnel engaged in work at the subject premises." [109-11] at 6 (paragraph 2 of Count III); [121] ¶ 28.[17] Lopez alleged, among other acts, that WSP:

---

[15] WSP objects to this statement on the basis that the record citation, [109-1] at 105:2–17, does not support the asserted fact. [124] ¶ 2. WSP is correct, the record citation should be [109-1] at 103:2–17, but this is a typographical error and will not be held against Nautilus at this stage. Because there is evidence in the record to support the asserted fact, it is included.

[16] Both Mr. and Mrs. Lopez were plaintiffs in the action, however Mrs. Lopez's claims are derivative of Mr. Lopez's claims, so for clarity's sake I refer only to Mr. Lopez's claims and suit.

[17] Nautilus admits ¶¶ 28–30 of WSP's Local Rule 56.1 statement but denies that the allegations were directed at Nautilus or GSG. [121] ¶¶ 28–30. In its reply brief, Nautilus points out that WSP cites to Lopez's 2019 Amended Complaint in its Local Rule 56.1 statement of facts, but the 2015 Amended Complaint is the complaint relevant to the duty to defend because the tender to Nautilus had the 2015 Amended Complaint attached. [125] at 3. Nautilus is correct that only the 2015 Amended Complaint should be considered. However, the language of the two complaints is the same in all relevant parts, except that the 2019 Amended Complaint has an extra paragraph in each count explaining the procedural history of the case. *Compare* [109-11] *and* [109-12]. I only consider and cite to the 2015 Amended Complaint. The version of the 2015 Amended Complaint submitted by Nautilus, [104-4], is missing page 8 which contains parts of Counts III and IV. For that reason I cite to the 2015 Amended Complaint submitted by WSP, [109-11].

> jointly and/or individually, and/or by their servants, agents, or representatives acting within the course and scope of their employment, were guilty of one or more of the following acts of negligence:
>
> a. Did negligently, carelessly and improperly maintain the subject premises so as to cause and/or permit the subject premises to become dangerous and unsafe, to the injury of the plaintiff;
>
> b. Did negligently, carelessly and improperly fail to provide and keep the subject premises in compliance with the applicable safety standards and practices, to the injury of the plaintiff;
>
> …
>
> h. Did negligently, carelessly and improperly fail to control and/or supervise the work being done at the subject elevated location, including the providing of a safe, suitable and proper fall protection, to the injury of the plaintiff
>
> k. Did negligently, carelessly and improperly cause and/or permit persons to perform work and/or otherwise be in an area without a safe, suitable or proper personal fall arrest system…

[109-11] at 6–7 (paragraph 5 of Count III); [121] ¶ 29. Lopez alleged these negligent acts caused his injuries. [109-11] at 7–8 (paragraph 6 of Count III); [121] ¶ 30. Lopez dismissed his case and then re-filed the case. [121] ¶ 27. The lawsuit settled pursuant to a confidential settlement agreement in October 2020. [121] ¶ 41.

## C.    Causation Evidence

Because the Lopez suit settled before trial, there is no judicial finding about the cause of the fall or liability. The parties submit varying evidence about the possible causes of the fall.

Nautilus includes facts about a change order implemented in February 2012 that "eliminated the requirement to hot dip galvanize the cut track spokes" on the Loop Track Renewal project. [119] ¶¶ 16–18. WSP, the CTA, and Ragnar Benson were the parties involved in the change order process. *Id*. GSG did not sign off on the

change order, it was a more significant change for which the CTA, WSP, and Ragnar Benson would make the decision. [103-1] at 3; [119] ¶¶ 19–20.[18]

Banks, GSG's safety manager for the project, was deposed in the Lopez suit. [121] ¶ 31. In her deposition she testified that employees use "rail skates" as fall protection when working on the L track. [121] ¶ 33. Before Lopez's fall, the safety plan did not require the use of more than one rail skate at a time. [121] ¶ 34. Banks testified that if a worker was using one rail skate and came to a place where the rails came together, there would be situations in which the worker would have to "take the rail skate off and put it on the other side" of the joint. [109-13] at 53:4–23; [121] ¶ 35. Banks testified that while the rail skate was off, the worker would face a safety hazard because there was nothing to protect him from harm if he slipped and fell. [109-13] at 54:13–21; [121] ¶ 35. Banks testified that other types of fall protection could be used, for instance if a horizontal lifeline was present or if the worker could access an area where there was a guardrail when he needed to disconnect the rail skate. [109-13] at 58:2–24. Banks also testified that she did not discuss with anyone how a rail skate had to be removed and replaced at couplings or that requiring the

---

[18] WSP denies the asserted fact that "GSG was not involved in the change order process" because that the cited deposition testimony does not support the conclusion that GSG was not involved in the change order process. [119] ¶ 19. Nautilus cites to Banks's testimony that she was not involved with change orders and she was the only person from GSG on the project, so she didn't think GSG was involved with change orders. [103-2] at 34:4–35:22. Nautilus also cites to deposition testimony from GSG's COO where he testified that he did not recall whether or not GSG had been involved with change orders for CTA projects. *See* [104] at 33:12–34:24. The deposition testimony is not absolutely conclusive, but the document itself shows that no one from GSG signed the change order, so I refer to that fact. The cited deposition testimony of WSP's corporate representative supports the assertion that CTA, WSP, and the general contractor would have been involved in making decisions about field markups and change orders. *See* [109-1] at 54:17–24.

use of two rail skates instead of one would give an employee "more tools to use to be protected from falls." [109-13] at 55:5–15, 56:14–57:1; [121] ¶¶ 36–37.[19] After the fall, the safety plan by Lopez's employer was revised to address situations where a worker needed more than one rail skate. [121] ¶ 40.

## D. Tenders and Investigation

WSP gave notice of Lopez's injuries to its insurance company, Liberty. [119] ¶ 30. Liberty assigned WSP's claim to Jeffrey Holmes, a senior technical claims specialist. [119] ¶ 31.[20] On March 30, 2015, Liberty tendered Lopez's 2015 Amended Complaint to GSG for defense and indemnification. [105-3]; [121] ¶ 42; [119] ¶ 32. WSP authorized Liberty to send the tender on its behalf. [121] ¶ 43. Nautilus acknowledged receipt of the tender and assigned the claim to Christina Remolina. [119] ¶ 46; [121] ¶¶ 44–45. Remolina contacted GSG and was told that GSG did not know whether GSG was involved in the site location. [119] ¶ 47. After this phone call, Nautilus did not have another phone conversation with GSG to discuss the tender.

---

[19] Nautilus's objections to portions of ¶ 36 and ¶ 37 as unsupported by the record citation are sustained. [121] ¶¶ 36–37. Banks's deposition testimony at the cited portion of her deposition, 55:5–15, does not include discussion of whether she was told employees could use two rail skate, that conversation happens later. *See* [109-13] at 55:5–15, 55:17–22. Additionally, Banks does not testify that it "would have been safer" to have two rail skates; in an uncited portion of her deposition, she answers that she is not sure if it would have been safer. *See* [109-13] at 57:2–58:1. Finally Banks testified that she had no personal knowledge of how or why Lopez fell, so I disregard WSP's asserted fact relying on her testimony of why Lopez fell. *See* [121] ¶ 38.

[20] WSP objects to paragraph 31 on the basis that it is unsupported by the record citation. [119] ¶ 31. WSP is correct that the cited portion of the record, [102] at 143:12–13, does not support the assertion that Mr. Holmes was assigned the Lopez claim. *Id.* But WSP admits to statements of facts that reference Holmes and submits documents which reflect that Holmes was the Liberty claims adjustor working on the Lopez claim for some portion of time. *See* [119] ¶¶ 32–33, 48, 51–52; [109-15]; [109-18]. There is sufficient evidence in the record to support that Holmes was a claims adjustor for Liberty handling the Lopez claim.

[121] ¶ 46.²¹ During its investigation of the tender, Nautilus did not contact WSP, counsel for Lopez, or any other contractors or subcontractors who worked on the Loop Track Renewal Project to discuss the matter. [121] ¶ 47. Neither did Nautilus contact GSG's employee, Joy Banks, to discuss the Loop Track Renewal Project; Nautilus did not attend Banks's deposition in the Lopez suit and did not obtain a copy of her deposition testimony. [121] ¶ 48.

On April 20, 2015, Remolina called Holmes to discuss the tender and sent a follow-up email; Remolina noted that GSG could not find evidence that they were involved with the project at issue and asked whether Liberty had a specific task number or more information about what GSG was doing on the site. [119] ¶ 48; [112-3] at 2–3. Remolina emailed Holmes again on May 8, 2015, to ask about more information. [119] ¶ 50. Holmes responding saying, "It may be a while … since this case is early in discovery … If you need to follow up, I would put your file out 90 days or so." [119] ¶ 51. Remolina and Holmes exchanged another set of emails in September 2015 which resulted in Holmes saying, "I am still trying to get more information." [119] ¶ 52.

On March 11, 2016, Holmes responded to an email from Remolina, writing "GSG had employees that would have been responsible for paperwork related to

---

²¹ Remolina had email contact with GSG. Specifically, Remolina emailed GSG's Chief Engineer on April 20, 2015, and said that she had spoken with the Liberty Mutual claims adjuster who had advised "he does not have any additional information on this matter" and Remolina wrote that she was going to tell the adjustor that "we need additional information in order to respond to both the request for defense and indemnity as well as the additional insured tender." [113] at 2; [119] ¶ 49. Although the subject line is about another matter, Remolina re-sent the email with a new subject line saying "Below email is for the Lopez case." [113] at 2.

quality control, inspection reports and at least one actual employee working as an inspector[.] So, I think depositions will be needed to iron out any details of GSG's involvement anyway." [119] ¶ 53; [121] ¶ 50. Remolina emailed Holmes again in July 2016 and May 2017, at which time Liberty wrote her: "Christina – we retained coverage counsel to assess the applicability of all policies, to include the PL policy. I will follow up with coverage counsel on their coverage opinion. We were of the opinion that the Rail Protective policy needs to be clarified if coverage was available and the PL policy as well. I will let you know our findings." [119] ¶¶ 54–55.

Over the course of two years, Remolina had fourteen conversations by email or phone with Liberty about the tender. [119] ¶ 56. Remolina testified that she consistently followed up to get information she needed such as "task orders or scopes of work that GSG was involved in" because "Liberty Mutual did not have very much information about the claim." [111-2] at 150:3–151:12. Remolina testified that she needed the "who, what when, where, and why" of the claim and "under what theory they were seeking the additional insured status for defense and indemnification." [119] ¶ 57.[22] Remolina's emails or calls every few months was the only investigation that Nautilus made into the tender. [121] ¶ 49.

In August of 2017, GSG informed Nautilus that its employees had been subpoenaed for depositions in the Lopez suit. [121] ¶ 51. Nautilus's claim handler

---

[22] The parties dispute whether Remolina needed more information to make a decision on the claim and whether Remolina could have sought more information from other sources. *See* [119] ¶¶ 49–58; [121] ¶ 55. That dispute is immaterial; neither party has explained how the dispute bears on their entitlement to judgment as a matter of law.

sent an email to GSG stating that because there was no claim filed against GSG, coverage had not been triggered under the policy. *Id*; [109-19] at 1. After WSP filed a third-party complaint against GSG in the Lopez case later that year, Nautilus provided GSG a defense. [121] ¶ 52. Nautilus defended GSG under Coverage E of the relevant policy. [124] ¶ 7; [109-20] at 2.

On April 17, 2018, Nautilus responded to WSP's tender and denied defense or other insurance coverage for the claims against it in the Lopez suit. [119] ¶ 59; [121] ¶ 53. One day later Nautilus filed a declaratory judgment case against WSP. [119] ¶ 60; [124] ¶ 9. Before it filed the declaratory judgment case in April 2018, Nautilus had neither defended WSP in the Lopez suit under a reservation of rights nor filed a declaratory judgment about the tender. [121] ¶ 54.

### E.    Nautilus Policy

The Nautilus Policy is divided into seven sections. Section One defines the different coverage parts, A through G. [119] ¶ 61. The relevant coverage parts here are Coverage A – Bodily Injury and Property Damage Liability and Coverage E – Professional Liability. [109-2].[23] Coverages A and E both contain language that

---

[23] Coverage A grants the following coverage:

1. Insuring Agreement:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage in excess of the deductible or self-insured retention, if any, to which this insurance applies. We will have the right and duty to defend the insured against suit seeking those damages. However, we will have not duty to defend the insured against any suit seeking damages for bodily injury or property damages to which this insurance does not apply.

[121] ¶ 6.

excludes "anything covered under any other Coverage Parts contained in this policy." [119] ¶ 65.

Section Two of the Policy is titled "Shared Exclusions" and the exclusions applicable to Coverages A and B include "6. Professional Liability – Bodily injury, property damage or personal and advertising injury based upon or arising out of the render of or failure to render professional services." [126] ¶ 8. "Professional services" is defined as "those services performed by you or on your behalf, that are related to your practice as an engineer, consultant, architect, or surveyor that are performed for others for a fee." [119] ¶ 64; [126] ¶ 9. The Policy says that "the words 'you' and 'your' refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy." [126] ¶ 10.

Section Three of the Policy defines "who is an insured":

SECTION III – WHO IS AN INSURED

4.      Solely with respect to Coverages A, B, and D, your clients, provided a written contract or agreement is in effect between you and the client, and solely with respect to your work performed by or on your behalf for that client. Such written contract or agreement must be in effect prior to the occurrence giving rise to the claim or suit for which the client seeks coverage. Your clients are covered under this policy only for Limits of Liability up to and not exceeding the amount required by the written contract or agreement and subject to the Limits of Liability of this policy.

[121] ¶ 7. The Policy also contains an endorsement, titled "ADDITIONAL INSURED – BLANKET." [121] ¶ 8. The endorsement amends Section III to include as an insured, only "with respect to Coverage A, B and D, any person(s) or organization(s) when you and such person(s) or organization(s) have agreed in a written contract or written agreement that such person(s) or organization(s) be added as an additional

17

insured to your policy." [109-2] at 38. This endorsement only grants coverage under

Coverage A and Coverage B "for claims or suits resulting from your work performed

for such person(s) or organization(s) in the performance of your ongoing operations

for the additional insured." [109-2] at 38.

Section Five lists the Policy Conditions and contains a "Separation of Insureds"

provision:

SECTION V – POLICY CONDITIONS

10. Except with respect to the Limits of Insurance, and any rights or duties
specifically assigned in this policy to the first Named Insured, this
insurance applies:
    a. As if each Named Insured were the only Named Insured; and
    b. Separately to each insured against whom claim is made or suit is
    brought.

[126] ¶ 11. WSP is not a named insured on the Nautilus Policy. [119] ¶ 45; [121]

¶ 4.

## III.   Analysis

### A.   Choice of Law

Nautilus urges me to apply New York law to interpret the Nautilus Policy

while WSP argues that Nautilus has waived the question of which law to use by

relying on Illinois law at the motion to dismiss stage. *See for example* [97] at 14–15

*and* [108-1] at 6–7.[24] Nautilus raised the issue of choice of law in briefs in support of

its first motion to dismiss, [20] at 3–4, its second motion to dismiss, [71] at 13, n. 10,

---

[24] WSP also argues that Nautilus waived the choice-of-laws issue when it failed to respond it
in its response in opposition to WSP's motion for summary judgment, but Nautilus
incorporated its argument on the issue from its memorandum of law in support of summary
judgment. [120] at 10.

and in response to WSP's motion to strike its affirmative defenses, [88] at 4–5, n. 2. Unlike the party in *Lott v. Levitt*, who first raised the issue on a motion to reconsider, Nautilus has signaled throughout the case that the choice of law is not a settled issue. *See Lott v. Levitt*, 556 F.3d 564, 567–68 (7th Cir. 2009) (first raising choice of law on motion to reconsider); *see also Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996) (party never raised choice of law until appeal from summary judgment and judgment on the pleadings). Furthermore, Nautilus makes the argument at the summary-judgment stage, rather than after the court resolved the merits. *Cf. McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684–85 (7th Cir. 2014) (party waived choice of law when it first raises the issue after it has lost on the merits). Because Nautilus has not waived the issue, I analyze the question using Illinois's "most significant contacts test."[25]

Under Illinois law, when an insurance policy lacks an express choice of law provision, a court looks to following factors to determine which state's substantive law to apply: (a) location of the subject matter, (b) the place of delivery of the contract, (c) the domicile of the insured or of the insurer, (d) the place of the last act to give rise to a valid contract, (e) the place of performance, or (f) other place bearing a rational relationship to the general contract. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225

---

[25] A federal court sitting in diversity jurisdiction applies the choice-of-law rules of its forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Gunn v. Continental Casualty Co.*, 968 F.3d 802, 808 (7th Cir. 2020). Illinois usually applies the forum state's law unless a conflict with another state's law is shown or the parties have agreed to another state's laws. *Gunn*, 968 F.3d at 808. Because Nautilus argues that New York state law applies and New York state law does not recognize estoppel of policy defenses in response to a breach of the duty to defend, a choice-of-law analysis is required.

F.3d 868, 873 (7th. Cir. 2000) *citing Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill.2d 520, 526–27 (1995).

For casualty insurance, the location of the insured risk is the most important factor. *See GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1115 (7th Cir. 1995) (Illinois courts apply the Second Restatement of Conflicts' "most significant contacts" test and the Second Restatement "takes the position that the law of the principal situs of the insured risk ought to be applied."); *see also*, Restatement (Second) of Conflicts § 193 cmt. b (Am. L. Inst. 1971) ("Provided, however, that the risk will be in a particular state for the major portion of the insurance period, the risk's principal location is the most important contact to be considered in the choice of the applicable law, at least as to most issues."). GSG, the named insured, is located in Illinois and the policy was delivered to GSG in Illinois. [121] ¶ 3. Because GSG was located in Illinois, the state where harm was most likely to arise was Illinois. And in this case, the actual harm occurred in Illinois and the underlying lawsuit was filed in Illinois. [119] ¶¶ 22, 26–27; [121] ¶¶ 25–27. All of these factors weigh in favor of applying Illinois law.

Nautilus argues that the parties to this case are WSP, a New York corporation, and Nautilus, an Arizona corporation, and concludes Illinois's "sole interest in this matter is linked to the place of performance." [97] at 15; *see also* [119] ¶¶ 7, 42. But the Second Restatement looks at the parties to the contract—i.e., the insurance policy—not the current litigants, and GSG is located in Illinois. *See* Restatement (Second) Conflicts § 193 (Am. L. Inst. 1971) ("The validity of a contract of fire, surety

or casualty insurance and the rights created thereby are determined by the local law of the state *which the parties understood was to be the principal location of the insured risk during the term of the policy*, unless with respect to the particular issue, some other state has a more significant relationship.") (emphasis added). Nautilus argues that WSP listed engineers not based in Illinois as "key personnel" for its contract with the CTA and that "engineering and construction management work could have been performed in multiple locations." [97] at 15; [119] ¶ 8. WSP's actions were not relevant to the parties' understanding of the principal location of the insured-against risk because WSP was not a party to the insurance contract.

When deciding what state's laws apply in a case where a party is seeking status as an additional insured, the party's domicile can be considered but it is not determinative. *See GATX Leasing Corp.*, 64 F.3d at 1115 (additional insured located in Texas, but so were the named insured, events at issue, and underlying lawsuits); *Nautilus Ins. Co. v. Pro-Set Erectors, Inc.*, 928 F.Supp.2d 1208, 1218 (D. Idaho 2013) (Idaho law applies where named insured was Idaho corporation, doing business in that state, policy was issued in Idaho and harm arose in Idaho, but additional insured seeking coverage is Washington corporation). Ultimately, the facts that WSP is domiciled in New York or that it listed some out-of-state personnel in its prime contract with the CTA do not give New York a more significant relationship with the insurance policy or this dispute than Illinois. Finally, unlike *Nautilus Ins. Co. v. Reuter*, cited by Nautilus for the proposition that place of performance should not be determinative, there are no questions of fact regarding whether GSG is truly an

21

Illinois business, nor is GSG's business so certain to take place in different states as were the door-to-door sales at issue in *Reuter*. *Id.*, 537 F.3d 733, 738–743 (7th Cir. 2008). Illinois law applies.

### B. WSP is an Additional Insured

The first question is whether WSP is an additional insured under the Nautilus Policy; if WSP is not an additional insured, then Nautilus owes it no duties. Illinois law views insurance policies like other types of contracts such that "the goal in interpreting an insurance policy is to ascertain and give effect to the intention of the parties as expressed in the policy language." *Scottsdale Ins. Co. v. Columbia Ins. Group, Inc.*, 972 F.3d 915, 919 (7th Cir. 2020) (internal citation omitted). The Nautilus Policy has two sections that allow for additional insureds: Section III and the Additional Insured Blanket Endorsement.

Section III includes as additional insureds "[GSG's] clients, provided a written contract or agreement is in effect between [GSG] and the client, and solely with respect to [GSG's] work performed by or on [GSG's] behalf for that client." [109-2] at 27; [121] ¶ 7. WSP was a client of GSG and the two entities had a written contract expressing their relationship. [121] ¶¶ 11, 15–16; [119] ¶ 34. The Additional Insured Blanket Endorsement provides additional insured status to "any persons or organizations when [GSG] and such persons or organizations have agreed in a written contract or written agreement that such persons or organizations be added as an additional insured on [GSG's] policy." [109-2] at 38. The WSP–GSG contract incorporated all the terms and conditions of the Prime Agreement (between WSP and

CTA), and those obligations and responsibilities included adding WSP as an additional insured. [76] at 12; [121] ¶ 12.

Under both provisions, for WSP to be an additional insured, the claim against WSP must relate to work performed by GSG for WSP. *See* [109-2] at 27 ("solely with respect to your work performed by or on your behalf for that client"); [109-2] at 38 (coverage for claims or suits resulting from "your work performed for such person(s) or organization(s) in the performance of your ongoing operations for the additional insured."). The Nautilus Policy defines "your work" as "work or operations performed by you or on your behalf … [including] warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your work, and the providing of or failure to provide warnings or instructions." [109-2] at 37.

### 1. GSG's Contracted-for Work

Two contracts defined GSG's work for WSP—the October 2011 Contract and the January 2012 Task Order for GSG's work on the Loop Track Renewal Project. The October 2011 Contract stated that GSG would provide project construction management services on a task order basis for the CTA's five-year Capital Improvement and that the specific services to be performed would be defined in each task order. [121] ¶¶ 11, 13; [106] at 3; [119] ¶ 34.

The January 2012 Loop Track Renewal Task Order required GSG to provide a "Safety Manager, Lead Field Engineer and Person-in-Charge support. The Safety Manager will monitor both Construction Management and contractor construction operations to assure work is performed in compliance with approved safety plans."

[109-8] at 4; [121] ¶ 17, 19. A safety manager "review[s] the contractor's safety program, safety plan submitted for a project, provide[s] recommendations to the CTA for acceptance or corrections that need to be made" and then "make[s] sure that the contractor is following their safety plan during the construction of the project." [109-1] at 107:17–108:1; [121] ¶ 20. During her deposition, GSG's safety manager Banks testified that she was responsible for providing "oversight to the contractor as they perform their work, review their process plans, discuss upcoming safety plans, [make] safety observations, [and] manage unusual occurrence reports." [121] ¶ 22. In her deposition for the Lopez case, Banks stated that her job was to observe the contractors performing their work and if anything required immediate corrective action, she would speak with the general contractor or correct the issue herself. [121] ¶ 32. One of the ways that Banks communicated with the contractor was to write safety observations reports that noted when she observed safety violations and what corrective actions she took; those reports included violations of fall protection requirements. [121] ¶ 24.

GSG's work for WSP included review of safety plans, submitting recommendations to the CTA regarding the safety plans, supervision of construction work to make sure that the work was being done in compliance with safety plans, and acting to remedy unsafe work conditions by either reporting the violations or taking direct action; the issues addressed included fall protection requirements.

2. *Lopez's Claims Arise Out of GSG's Work for WSP*

The Additional Insured Blanket Endorsement provides coverage "for claims or suits resulting from [GSG's] work performed"—so there must be some causal relationship between GSG's work and the suit. [109-2] at 38. Section III's language also requires a connection between GSG's work and the suit—contractual clients are additional insureds "solely with respect to [GSG's] work." [121] ¶ 7. Therefore, a client can only be an additional insured to the extent that their potential liability arises from GSG's work. I do not read "solely with respect to" to require that GSG's work be the sole *cause of* the client's liability. That would be a vicarious liability requirement, and insurance companies know how to write those kinds of contracts. *See United Fire & Cas, Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 578 (7th Cir. 2021) (language of the additional insured section gave additional insured status "only with respect to [the additional insured's] liability for 'bodily injury' … which may be imputed to that person or organization directly arising out of [named insured's] acts or omissions."). Instead, "solely" limits the amount of money an additional insured can recover from the Nautilus Policy to the share of liability that is attributable to GSG's work for the client.

The 2015 Amended Complaint alleges that Ragnar Benson and WSP "jointly and/or individually, and/or by its agents, servants or representatives, pursuant to contract and/or otherwise voluntarily … did undertake, operate, perform, supervise, control and/or maintain the construction site and/or construction work being performed at the subject premises and the safety to be afforded personnel, including

the plaintiff, CARLITOS LOPEZ." [109-11] at 6. The complaint therefore seeks to hold WSP responsible for its failure to keep the work site safe, which was part of the work that WSP subcontracted to GSG through the role of safety manager.

The 2015 Amended Complaint specifically alleges that Ragnar and WSP were negligent in their "compliance with applicable safety standards and practices", and that they failed to "supervise the work being done at the subject elevated location, including the providing of a safe, suitable and proper fall protection" and permitted "persons to perform work and/otherwise be in an area without a safe, suitable or proper personal fall arrest system." [109-11] at 6–7. The safety manager is responsible for compliance with applicable safety plans, [121] ¶ 19, for providing oversight to the contractor as they perform their work, [121] ¶ 22, and to provide recommendations about safety to the CTA or the contractor. [121] ¶¶ 20, 22. The 2015 Amended Complaint's allegations directly implicate the work that GSG was doing for WSP and show a sufficient connection between GSG's work and the Lopez suit to find that WSP is an additional insured under the Nautilus policy.

Nautilus says Lopez's claims did not arise out of GSG's work for WSP for three reasons—(a) GSG's work was to ensure compliance with safety plans and the Lopez suit did not arise out of compliance issues, (b) Lopez was seeking to sue WSP for its own negligence, and (c) there were other causes of the suit.

First, Nautilus argues that GSG did not create or approve safety plans; the safety manager's job was only to monitor compliance with safety plans. [120] at 3. Nautilus emphasizes the uncontested fact that WSP is unaware of any work

completed not in compliance with the safety plan, [119 ¶ 25], and concludes that lack of compliance can't be the basis of Lopez's claims. [120] at 3–4. One of the allegations in the 2015 Amended Complaint, however, was that the work was not done in compliance with applicable safety standards and practices. [109-11] at 6. That allegation is directly connected to GSG's contracted-for work. Furthermore, the evidence in the record is that GSG's safety manager was also responsible for reviewing the contractor's safety program and "provid[ing] recommendations to the CTA for acceptance or corrections that need to be made." [121] ¶ 20. GSG's safety manager Banks testified that she was responsible for "reviewing [contractor's] process plans, discuss[ing] upcoming safety plans, [making] safety observations, [and] manag[ing] unusual occurrence reports." [121] ¶ 22. GSG was not ultimately responsible for the content of safety plans, but the evidence does show that GSG's safety manger was one part of the iterative process to create and implement the plans. Because the Lopez suit implicates both compliance with safety plans and the general provision of a safe workplace, the suit stems from GSG's work and WSP is an additional insured under the Nautilus Policy.

Nautilus also argues that Lopez was suing WSP for its own negligence, as evidenced by the fact that Lopez did not name GSG as a defendant in the suit. [97] at 9. A suit need not expressly allege that the named insured was negligent in order to be the basis for additional insured status. *See Scottsdale Ins. Co.*, 972 F.3d at 920 ("We agree with the district court that the mere fact that [injured party] did not bring a negligence claim against [named insured] does not mean [proposed insureds] cannot

be liable to [injured party] based on and arising out of [named insured]'s then-on-going operations performed for them.").

More substantively, Nautilus says that Lopez did not name GSG on purpose because he only sought to hold WSP liable for its own negligence and maybe also that of another subcontractor, PMCS. [97] at 8, 10. The evidence in the record reflects that WSP hired PMCS to perform track construction and track specialist support, which included "monitoring the construction contract work on a daily basis to ensure the project is completed in accordance [with] CTA's safety, quality, cost and schedule objectives." [119] ¶¶ 12–13; [124] ¶ 1. Putting aside the inconsistency that PMCS was also not named in any of Lopez's complaints, the fact that his claims could have arisen in part out of PMCS's work does not make it impossible for his claims to also arise out of GSG's work; the parties could be jointly liable.

Nautilus says the Lopez suit is about WSP's actions because WSP controlled the GSG's safety manager's schedule and the GSG safety manager was not on site at the time of the fall. [97] at 10; [120] at 4. In sum, Nautilus seems to be arguing that because GSG's safety manager was not on site when Lopez fell, the Lopez suit cannot arise out of GSG's work. I disagree. First, as discussed above, the role of safety manager encompassed more than just observation and reporting and her work reviewing safety plans and processes contributed to the general safety at the worksite. The ongoing effect of a safety manager's work on the construction site distinguishes the facts of *Cross v. Wells Fargo Alarm Servs.*, in which the court found that the owner of the building who only contracted for guard services for 16 hours a

28

day was ultimately responsible for the safety of the building. *Id*. at 82 Ill.2d 313, 318–20 (1980). Even if the safety manager's observation and reporting work was limited to the time she was on site, her work to ensure compliance with applicable safety standards had an effect on the habits and practices at the work site.

Furthermore, in this case, the safety manager was responsible for more than just compliance, she reviewed and discussed plans and processes with contractors and made recommendations. *See* [121] ¶¶ 20, 22. GSG's work for WSP encompassed more than just a general duty to provide a safe workplace, so Lopez's allegations that the work area was not maintained safely directly implicated GSG's work. *Cf. Nat'l Fire Ins. of Hartford v. Walsh Constr. Co.*, 392 Ill.App.3d 312, 317–20 (1st Dist. 2009) (finding no additional insured status for general contractor when named insured was roofing subcontractor who had no special responsibility for safety and complaint alleged that general contractor's employee caused the fall by moving a section of roof support).

Third, Nautilus brings up a change order that allowed the use of non-galvanized bolts or spikes on the project and concludes that the use of non-galvanized bolts "among other engineering work, and the track construction supervised by PMCS, were the basis of WSP's liability." [97] at 8. But Nautilus provides no support for its assertion that the bolts (or spikes) were connected to the Lopez suit. And, as already stated above, just because WSP or even PMCS contributed to an unsafe work environment, that does not preclude the possibility that GSG contributed to an unsafe work environment, which was the gist of Lopez's complaint.

The Lopez suit arose out of GSG's work for WSP and therefore WSP is an additional insured under the Nautilus policy.

## C.   Duty to Defend

An insurer's duty to defend is broader than its duty to indemnify. *United Fire & Cas. Co. v. Prate Roofing & Installations*, 7 F.4th 573, 579 (7th Cir. 2021) *citing Outboard Marine Corp. v. Liberty Mut. Ins. Co.* 154 Ill.2d 90, 125 (1992). To "determin[e] whether the insurer has a duty to defend, the court must look to the allegations in the underlying complaint and compare those allegations with the relevant coverage provisions of the insurance policy. If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage provisions, then the insurer has a duty to defend the insured in the underlying action." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 393 (1993). An insurer may only decline to defend based on an exclusionary clause in the policy if it is "clear and free from doubt" that the exclusion applies. *Zurich American Ins. Co. v. Ocwen Fin. Corp.*, 990 F.3d 1073, 1078 (7th Cir. 2021) (citation omitted). "Reasonable disagreement about the applicability of an exclusion must be resolved in favor of the insured." *Id.*

### 1.   *Lopez's Complaint Triggered Duty to Defend*

The 2015 Amended Complaint alleges that WSP was responsible for the safety at the work site, [109-11] at 5–6 (paragraph 2 of Count III), that WSP was negligent in maintaining the work site in a safe condition, [109-11] at 6–7 (paragraph 5 of Count III), and that WSP's negligence caused Lopez's physical injuries. [109-11] at 7–8

(paragraph 6 of Count III). Coverage A of the Nautilus Policy states that Nautilus will "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage …. We will have the right and duty to defend the insured against suit seeking those damages." [121] ¶ 6. WSP was an additional insured for Coverage A, so Lopez's allegations that WSP's negligence in keeping the worksite safe caused his physical injury fall within the scope of the Nautilus policy and triggered Nautilus's duty to defend.

Nautilus argues that the language of the 2015 Amended Complaint only seeks to hold WSP liable for its own negligence and under the policy it is an additional insured only for claims resulting from GSG's work. *See* [125] at 4. But the language of the 2015 Amended Complaint is expansive—"Ragnar and [WSP], jointly and/or individually, and/or by its agents, servants or representatives, pursuant to contract, and/or otherwise voluntarily, did undertake the protection of personnel engaged in work at the subject premises." [109-11] at 6. Where a plaintiff does not have specific information about the contractual relationships between the parties at the worksite, they will seek to draft their complaint in a broad manner. *See United Fire & Cas. Co.*, 7 F.4th at 582. All that is needed to trigger the duty to defend is the allegation of facts "potentially within policy coverage." *Id.* at 581. The complaint invokes jobsite safety (GSG's responsibility in part) and reaches the acts of WSP's contractual agents. That is enough to fall within the duty to defend.

## 2. *The Professional Services Exclusion Does Not Apply*

Nautilus argues that it did not have a duty to defend WSP because Lopez's suit is based on WSP's "professional services" and there is no coverage for professional services liability for additional insureds. [97] at 10–11. Nautilus argues there are two ways the Nautilus Policy excludes coverage arising out of professional services for additional insureds.

First, Coverage A, the section of the Policy under which WSP was seeking coverage, excludes "bodily injury, property damage or personal and advertising injury based upon or arising out of the render of or failure to render professional services." [119] ¶ 63. Nautilus says that WSP's work was professional services, so it was clear from the complaint that there was no duty to defend.

WSP responds that the exclusion of professional services in Coverage A does not apply to it. The Nautilus Policy defines professional services to mean "those services performed by you or on your behalf, that are related to your practice as an engineer, consultant, architect, or surveyor that are performed for others for a fee." [119] ¶ 64. The Policy defines "you" and "your" as follows: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." [126] ¶ 10. The parties agree that WSP is not a named insured under the policy. [119] ¶ 45; [121] ¶ 4. Therefore, WSP argues, the professional services exclusion in Coverage A

does not apply to its claim. Nautilus does not respond to this argument substantively, instead turning to the second professional services exclusion in the Policy.[26]

Coverage E of the Nautilus Policy says that Nautilus "will pay those sums that the insured becomes legally obligated to pay as damages …. that result from professional services to which this insurance applies." [109-2] at 18. Coverage A, the part under which WSP seeks coverage, excludes "[a]nything covered under any other Coverage Parts contained in this policy." [119] ¶ 65; [109-2] at 9. Because claims arising out of professional services are covered through Coverage E, Nautilus argues, they are excluded from Coverage A and WSP's claim is clearly excluded. [125] at 8. But the exclusion of Coverage E from Coverage A does not result in an exclusion of WSP as an additional insured under Coverage A. There is no additional-insured coverage in Coverage E of the Nautilus Policy. *See* [109-2] at 27 ("solely with respect to Coverages A, B and D") and [109-2] at 38 ("with respect to Coverage A, B and D"). And the professional services covered under Coverage E, and therefore excluded from Coverage A, are only those performed by GSG ("you"). Carving out Coverage E from Coverage A ends up excluding only GSG's professional services, and does not clearly exclude the additional insured, WSP, from Coverage A and Nautilus's duty to defend.

Nautilus relies on *Prisco Serena Sturm Architects, Ltd. v. Liberty Mutual Insurance Company* to support its argument that the professional services exclusions

---

[26] Nautilus asserts WSP's reliance on the "you" and "your" definition is misplaced because Coverage E's "professional liability" is different than the "professional services" excluded from Coverage A. [125] at 8. But Coverage E uses the term "professional services," [118-2] at 18, and does not have a different definition of the term than the general definition of "professional services" provided in Section VII of the Policy, which refers to "services performed by you or on your behalf." [119] ¶ 64.

apply to additional insureds such as WSP. [97] at 11; [120] at 7. However, the language of the policy in *Prisco Serena* was different in an essential way—the definition of a "Named Insured" included "any person or organization to whom the Named Insured is obligated by an agreement to provide insurance such as that afforded by this endorsement." *Prisco Serena Sturm Architects, Ltd. v. Liberty Mut. Ins. Co.*, 126 F.3d 886, 889, 893 (7th Cir. 1997). For that reason, the "you" in the professional services exclusion included the additional insured and the exclusion applied. *Id.* Because the Nautilus Policy does not expand the definition of a Named Insured in the same manner, the professional services exclusions do not apply to WSP.

Nautilus's duty to defend was triggered when WSP made its tender. *Oakley Transport, Inc. v. Zurich Ins. Co.*, 271 Ill.App.3d 716, 720 (1st Dist. 1995) (The duty to defend "is to be determined at the time the insured makes a tender of defense.") (finding auto use exclusion precluded coverage). The parties go back and forth about investigation Nautilus did (or did not) make into the claim. *See generally* [120] at 5 and [119] ¶¶ 32, 47, 50–56. But "[a]n insurer who has received such a tender cannot wait until the resolution of the underlying case, or some portion thereof, in the hope that there may be some finding of fact which negates the duty to defend." *Oakley Transport, Inc.*, 271 Ill.App.3d at 720. Nautilus has made no argument that WSP breached any notice requirements and instead relies on its argument that the professional services exclusion applied and excluded coverage of WSP's claim. *See* [120] at 13. As will be discussed below, if Nautilus believed that the professional

services exclusion applied to WSP's claim then its recourse was to file a declaratory judgment action.

Nautilus had a duty to defend WSP and it failed to do so. The remedy for breach of the duty to defend is "liability for the cost and expense which [the insured] was put to by reason of [the insurer's] breach of the contract and embraces reasonable attorney fees." *Conway v. Country Cas. Ins. Co.*, 92 Ill.2d 388, 397 (1982) (internal citation omitted). WSP has not provided evidence of its damages from Nautilus's breach of the duty to defend nor have parties briefed how to calculate those damages. A judgment of damages is therefore inappropriate.

### D.   Estoppel and the Duty to Indemnify

Illinois law recognizes a general rule of estoppel for breach of duty to defend:

> an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured. Rather, the insurer has two options: (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage.

*Employers Ins. of Wausau v. Ehlco Liquidating Trust et al.*, 186 Ill.2d 127, 150–51 (1999). Because Nautilus neither defended WSP under a reservation of rights nor filed a declaratory action (waiting until after it denied the tender), estoppel is appropriate.

Nautilus makes two arguments regarding estoppel: (a) that estoppel does not apply if there is no coverage or potential for coverage, as Nautilus believes is the case here due to the professional services exclusion; and (b) that New York law, which does

35

not recognize the doctrine of estoppel in this circumstance, applies. Both arguments have already been discussed. I find that the professional services exclusion does not apply to WSP's claim. Furthermore, at the duty to defend stage, the professional services exclusion's application would have to be "clear and free from doubt" to excuse Nautilus's inaction. *Zurich American Ins. Co.*, 990 F.3d at 1078. Second, Illinois law applies to this case. As such, Nautilus is estopped from arguing that it should not pay out on the claim, i.e., indemnify WSP, because WSP failed to comply with a policy provision.[27]

Nautilus's obligation to indemnify WSP for its covered losses is ripe for adjudication because WSP is legally obligated to pay damages to Lopez. *See Universal Underwriters Ins. Co. v. LKQ Smart Parts, Inc.*, 2011 IL App (1st) 101723 ¶ 14 ("The duty to indemnify arises only when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy.") (internal citations omitted). The amount of the covered loss, however, is not certain, so judgment on the amount of the insurance payout is premature. This is because "[t]he duty to indemnify arises if the insured's activity and the resulting loss or damage *actually* fall within the CGL's policy's coverage." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 128 (1992). As discussed above, WSP is covered

---

[27] Nautilus argues that WSP lacks standing to bring its claims because any damages it receives would be paid to Liberty under the terms of Liberty policy. [120] at 15. But the amount that WSP stands to recover (or ultimately retain) is not the same as whether WSP suffered a cognizable injury or has a stake in the case; it paid its deductible so has standing to present the controversy.

by Nautilus only for the share of the Lopez settlement that is attributable to GSG's negligence.

WSP argues that because the "primary focus" of the Lopez claims was a potentially covered loss under the Nautilus policy, Nautilus should be on the hook for the entire amount that WSP paid to Lopez. I disagree. There are no facts in the record that establish that WSP's liability was mostly based on GSG's work, such that GSG's negligent work was the "primary focus" of WSP's settlement. The only evidence of how the parties to the underlying action thought about their relative shares of liability is a "large loss report" prepared by Nautilus in preparation for a mediation in the Lopez case when it represented GSG against WSP's third-party complaint. *See* [121] ¶ 56. Nautilus's estimate of GSG's share of the liability is not an admissible source of evidence about the facts that led to the Lopez fall or the apportionment of responsibility. For that reason, the amount of the covered loss is not certain and a damages judgment is premature.

## E. Prejudgment Interest

WSP asks for prejudgment interest on the costs of defense and indemnification. [108-1] at 26. Illinois law allows for prejudgment interest on damages in an insurance declaratory judgment action, but only when the amount due under the policy is "liquidated, i.e., due and capable of exact computation." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 355 (7th Cir. 2010) ("A sum is liquidated if calculation does not require judgment, discretion, or opinion.") (internal citation omitted). As discussed above, there are questions of fact (and law) about WSP's

damages from Nautilus's breach of its duties to breach and indemnify. The amounts due to WSP were not legally certain such that prejudgment interest is appropriate. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. American Motorists Ins. Co.*, 707 F.3d 797, 801–02 (7th Cir. 2013).

## IV. Conclusion

Nautilus's motion for summary judgment is denied. WSP's motion for summary judgment is granted in part, denied in part. Summary judgment is granted in favor of WSP on liability. Nautilus had a duty to defend WSP under its policy, Nautilus breached the duty to defend so it is estopped from asserting any defense to WSP's claim for indemnification. Nautilus must indemnify WSP to the extent there is coverage, i.e., for that portion of WSP's liability that arises out of GSG's work.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  May 2, 2023

38